## Page 1

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

Cause No. 98-726C

GRASS VALLEY TERRACE, )
a California Limited Partnership, et al., )
)
Plaintiffs, )
)
vs. )
)
THE UNITED STATES, )
)
Defendant. )

DEPOSITION OF TOM VASILATOS

Scottsdale, Arizona
Thursday, April 29, 2004
9:30 a.m.

REPORTED BY: JUDY LOVE-HOSLER, Arizona CSR No. 50540

## Page 2

APPEARANCES:

FAEGRE & BENSON LLP
BY: JEFF H. ECKLAND, ESQ.
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, Minnesota 55402-3901
Appearing on behalf of the Plaintiffs

U.S. DEPARTMENT OF JUSTICE
BY: KENNETH S. KESSLER, ESQ.
Trial Attorney
Commercial Litigation Branch
Civil Division
Classification Unit, 8th Floor
1100 L. Street, N.W.
Washington, D.C. 20530
Appearing on behalf of the Defendant

. . .

## Page 3

I N D E X

E X A M I N A T I O N


| | | PAGE |
|---|---|---|
| BY MR. KESSLER | | 6 |
| BY MR. ECKLAND | | 191 |


E X H I B I T S


| DEFENDANT'S | | |
|---|---|---|
| 27 | Plaintiff's lawsuit declaration (Attached) | 71 |
| 28 | Real estate mortgage USDA form (Attached) | 83 |
| 29 | 1984 Assumption Agreement (Attached) | 106 |
| 30 | Real estate deed of trust (Attached) | 108 |
| 31 | Prepayment request for Wishing Well I (Attached) | 127 |
| 32 | 12-11-00 letter to S. Morin from T. Vasilatos (Attached) | 154 |
| 33 | 12-26-00 letter to T. Vasilatos from S. Morin (Attached) | 155 |
| 34 | 10-20-01 letter from S. Morin to T. Vasilatos (Attached) | 155 |
| 35 | 12-17-02 letter to T. Vasilatos from S. Morin (Attached) | 156 |
| 36 | Declaration No. 4 of T. Vasilatos (Attached) | 157 |
| 37 | Declaration No. 2 of T. Vasilatos (Attached) | 165 |


## Page 4

Index, continued


| | | |
|---|---|---|
| 38 | 2-23-84 assumption agreement (Attached) | 167 |
| 39 | 11-10-00 letter to S. Morin from T. Vasilatos (Attached) | 168 |
| 40 | 11-30-00 letter of response to Prepayment request (Attached) | 171 |
| 41 | Declaration No. 3 of T. Vasilatos (Attached) | 175 |
| 42 | 11-10-00 request to prepay Friendship House II (Attached) | 177 |
| 43 | Documents provided by government as Exhibit 31 (Attached) | 191 |
| 44 | P-GV 00326 and 00327 missing from Exhibit 31 (Attached) | 191 |
| 45 | P-GV 00321 through 00323 missing from Exhibit 31 (Attached) | 191 |
| 46 | P-GV 00319 through 00320 missing from Exhibit 31 (Attached) | 191 |
| 47 | P-GV 00335 through 00337 missing from Exhibit 31 (Attached) | 191 |
| 48 | Duplicate of letter in Exhibits 31 and 43 (Attached) | 191 |


* * *

EXHIBIT C

Page 113

implemented -- for some reason when they say one percent for 50 years, when you add the principle in that, it became like three percent, and it was applied differently.

I think some of the government officials were applying the date that the -- the first of the month. Others, when the check came in and the government somehow figured out that there was two -- they would let you stay with the old amortization or you could do the new one and I can't remember which was to the advantage of the borrower, but one was to the advantage of the borrower, and again, it was whether you wanted the principle to go down faster or whether you wanted less interest.

Q. Do you remember what you did for Wishing Well I?

A. No, I don't. I can't remember at all.

Q. Okay. And just to be clear, except for me handing this to you during a discussion about Wishing Well I, there's no basis upon which to conclude that this Exhibit No. 30 refers to Wishing Well I?

A. Correct. Yes.

Q. And even now, I'm suggesting I don't know. Okay.

Do you recall that when you reamortized

Page 114

your Wishing Well loan in 1980, whether it contained a restrictive use provision?

A. I don't recall.

Q. And do you know what I mean by a restrictive use provision? What do you think I mean?

A. You mean that there was no restrictive; I could pay any time?

Q. What do you think I mean when I say restrictive use provision? How do you use that?

A. Well, restrictive use would mean that you couldn't prepay. You would have to -- you would have to go through the government steps of whether to take an equity loan, an RA loan, a higher return on investments, a G-4, all that kind of -- that could mean it was a restrictive use.

Q. Well, on Exhibit 30, please do take a look at Exhibit 30. Turn to page GV 3081, the second page. Looking at the paragraph I'm pointing to that starts with the borrower, any successors, take a minute to read that paragraph, please and tell me if you've ever seen anything like that before.

(Pause.)

A. Okay. Yeah.

Q. In any of the four properties that are involved in this lawsuit, have you seen a clause like

Page 115

that before?

A. Specifically, I can't remember but I do remember reading some kind of a clause about the 20-year restriction. It was in a different format, I believe. It outlined that this was tied up for 20 years and you couldn't prepay it unless the government let you, unless they initiated in less than 20 years.

Q. Do you recall if a similar type of provision was included in your reamortization in 1980 in Wishing Well I?

A. I don't recall. It probably was.

Q. What do you base that on, when you say it probably was?

A. Well, there was -- I think some attorneys have stated that the reamortization would automatically trigger a 20-year restriction, and it's a technical thing, and I can't --

Q. Which attorneys?

A. My attorneys. Since there was apparently some policies or government regulations that when there's a reamortization, that the property automatically goes into a 20-year restriction different than an assumption, and so I -- but it's too technical for me to understand. That's what they told me. They told me that they have some basis for that.

Page 116

MR. ECKLAND: Well, don't reveal the substance of conversations with your attorneys. Objection.

THE WITNESS: Okay.

Q. (BY MR. KESSLER) After 1980, after you reamortized your loan, what happened next with Wishing Well I and the FMHA concerning your efforts to try to get out of the program or to convert your property into some other type of commercial or investment property?

A. Okay. Well, I met a real estate salesman in 1986 that was from California, and he said there's money in southern California with investors to buy subsidized housing. So to make a long story short, I took all eight projects to Santa Monica, and tried to sell them.

Now, this was -- this was probably a foolish move in Monday morning quarterbacking it because selling one in 1986 or all of them would have triggered a large income tax by it because I had negative capital accounts in most of the projects.

So if you have a negative capital account and you sell -- it's 200,000 and you sell it for even a dollar, you have to pay income tax on that 200,000.

So what is good for the first ten or 15

Page 117

years of depreciation is you're taking less income tax, but Uncle Sam gets you when you sell 15 or 20 years later, but no one was interested in -- I couldn't get any offers because when they read them, they knew there was that 20-year clause on all, and they assumed that one wasn't enough, and they didn't believe that -- they didn't believe that you could sell without restriction. So I gave up on that, and then, of course, we're winding down building this in '83, '84.

Then, in '86 through '90, I got into some commercial projects, sort of did nothing, and then, around 1989, I decided to -- that I thought I was smarter than the Farmer's Home and that I could take their operating expenses, reduce them, get rid of the audit, cut the property management fees in half and I could form a Vasilatos, Ltd. or a nonprofit organization, and move it from that partnership, the existing partnership into Vasilatos nonprofit and keep it at also the same rates until the market turned or we did something else with it.

And I didn't get into any of the -- I, at that time, didn't even know about the 1988 federal statute, law that created all these restrictions for prepayment. So I was just shooting from the hip, so to speak, and I went in there --

Page 118

Q. Went in where?

A. I went to Farmer's Home and asked if I could do such a thing.

They responded two ways: One, they said well, this assumption agreement now forces you to have it classified as the 20-year restriction, and secondly, you can't be a party to an existing limited partnership and move it into a family nonprofit 501 C 3 because you're in that, too. So they didn't like that.

About the same time they came back with those comments, I had finally realized that I couldn't pencil out the venture as a low income project. So I just gave up. I just didn't do anything. I just sort of withdrew, and went on my way because if I remember correctly, I was building a summer home and I was in the throws of building a unit, a standard luxury apartment for market rates.

Q. What year was that?

A. That was 1989, 1990, 1991. So then finally, after I get done with all my commercial projects and personal projects, then I find out. Really, I'm apprised of what this 1988 law says, and I decided well, I'll try it now, ideas of a nonprofit, and go right to a market, a prepayment request to Farmer's Home, which I did, and then, that's when --

Page 119

Q. When was that?

A. That was 1994, and in 1994, I gave Kemper Consulting, who is a civil engineer and an architect, he had two deals. He did the market study in 1994 that told me yes, you can rent Wishing Well I for 442 a month, and then, more -- I didn't get -- I don't think we submitted a complete package. Farmer's Home came back and said you need to supply more information to us.

I think we did that, and then, I don't know -- I really don't know the reason, but we got -- that was -- that was the first time we got, I believe, rejected on it, and that was the first time.

Then, I don't know why we had a lapse in that. I didn't pursue it to conclusion, but then, I did a different tack. Instead of sending all the paperwork in or doing it, I finally realized that the government in the final analysis, they have a judgment call where they can say there is a need for this. So you can go through all the hoops, spend, five, six, seven, 10,000 and then, they can say you can go through the hoops.

I thought I had a case in 1994 because there were 232 apartment units for low income in Marysville in Snohomish County.

Subsequently, I found out that I didn't

Page 120

realize at the time -- I never put the application in because the government only looks at the city, the need in Marysville or the need in this outlying area here (indicating).

You can take the whole county and say because there is 232, there is enough units. So I had to admit there was a need in Marysville, and I backed off, and that is essentially the same story in 2000, but that way, I just went to them and said tell me, bottom line, if there is a need. If there is a need, then you and I can save a lot of time and money of not putting in an application.

Q. What did they say?

A. They wrote a letter saying yes, there is probably a need and you probably won't get it. That was it. So that's the end of my efforts.

Q. Going back to 1986 when you were trying to sell the property, did you bring that to the attention of Farmer's Home in 1986?

A. No. No. No. I just went down there on sort of a Monday morning quarterback, wild goose chase to see if there would be a needle in the haystack, and I'm sure by that one realtor that I had working in the area, LA, that he brought to the meeting and I put the presentation on the projects. I had them all fairly

Page 121

well documented, pictures of them, et cetera.
Q. I think you said something to the effect of -- and I want to ask you what you mean by it -- that Wishing Well I by itself wasn't enough.
A. Yes.
Q. What were you referring to?
A. I was referring to that with a $2,000 return, an eight percent return on the original money was like 2,000 a year, and based on trying to sell it at the, quote, replacement value of a million, four, there was no one that would be interested in paying -- getting no dividends less than one percent.
Q. But you went there to try to sell all eight. Right?
A. Yes.
Q. So why were you segregating out just Wishing Well I?
A. I wasn't segregating. I was just saying that, even though I assumed in my own mind that I could sell all of Wishing Well I because there was no prepayments, I could sell it because of no restriction because it was prior to 1979 project, and I thought maybe, but it was too small. It was just too small.
Q. Okay. So of the eight, Wishing Well was different than the other seven because it didn't have a

Page 122

restriction on the prepayment?
A. Yes, but the investors didn't see it that way. They saw it that it probably would be restricted, there would be restrictions. So they backed off.
Q. What kind of restrictions?
A. Well, like you would have to wait or couldn't buy it and convert it to market rate right away, but I can't remember all the reasons.
Q. So in your view, Wishing Well was in a different posture as far as a restriction on prepayment went from the other seven?
A. Yes, the other seven had the 20 years. You had to leave them in the program there, and, as I say, I finally realized I could not -- I could not sell these projects because of the negative capital account.
Any profits, the income tax would be double of normal, and so I have to get them in my own name. I have to prepay them in my name, reborrow more money to fix them or do whatever it takes and put them in privately. All the other options never catch the rabbit.
Q. And that was about in 1989 that you brought this other approach to FMHA?
A. Yes.

Page 123

Q. So you did approach FMHA on that one?
A. Yes.
Q. And what did they say?
A. Well, they --
Q. Let me interrupt if I could. I know you also told me what they said to some extent. Let me rephrase the question to be more specific.
Did you request any information from FMHA before you approached them with this plan to convert it to a Vasilatos nonprofit?
A. No. I think I negotiated it because I didn't even know all the restrictions. I was not aware of the 1988 law at the time, nor the moratorium, any of that.
Q. So what was your first contact with FMHA about this plan? Was it in writing?
A. Yeah. It was in writing and I sent it to them and said I would like to form a nonprofit, and I gave them some numbers I thought could convert this into a private nonprofit, and only raise rent about seven to $15, slash a lot of expenses, and be able to make it feasible.
Q. Now, you said you weren't aware of the 1988 law? Is that what you said?
A. Yes.

Page 124

Q. In your mind, was this an attempt to prepay the existing note on Wishing Well?
A. Yeah. I was either attempting to prepay or a transfer from existing limited partnership into a Vasilatos nonprofit.
Q. And the purpose of the transfer was to get out from under some of the restrictions, wasn't it?
A. Yes. Correct.
Q. So it would have the same effect from your standpoint as prepaying with a conventional loan, if that's what you had to do?
A. Yes. Yes.
Q. And at that time, you believe that Wishing Well was not subjected to a 20-year restriction on restricting your right to prepay?
A. Well, at that time, the government sent a letter saying it was.
Q. Well, I'm asking what you requested.
A. Well, I didn't think so, and after I gave up in '90 and backed off and didn't pursue, then I thought -- I don't know -- six months or a year later, I thought well, I had better get this cleared up. I don't want this 20 years restriction.
So I had my -- I had an attorney research it. He sent a letter to Farmer's Home, stating