Page 125

**that this assumption, reamortization may trigger a 20-year, but this assumption didn't, and it was shortly after that -- a month or two -- Farmer's Home sent us a letter back saying you're right. We made a mistake. We checked the headquarters in Washington D.C. and this doesn't trigger a 20-year.**

**So we were under an assumption for 20 years, and then, we got it freed in '93 or '92, in that time period, and that's another reason probably why we were looking in 1994 to do another prepayment, but do it per the book, so to speak, this time.**

Q. So your -- and I'm trying to emphasize -- in your view, for your purpose in 1994, was Wishing Well I under a 20-year restrictive -- I call it a restrictive use provision, which means restricting your right to prepay for 20 years?

MR. ECKLAND: Objection to the form to the extent you're calling for a legal conclusion, but he can answer.

THE WITNESS: As far as the assumption time, I didn't think that was true, but subsequently, the reamortization may have triggered a 20-year. Whether the government knew it or the attorneys or anyone, if it was there and there was a regulation, someone missed it. They could still say that you had a

Page 126

20-year restriction from 1980 to the year 2000 for Wishing Well I, but I wasn't involved in that.

Q. (BY MR. KESSLER) All right. Just tell me -- don't tell me what anyone told you, what your lawyers told you, but just tell me what the date was when you learned, when you learned of the existence of what you just said, which is that the reamortization may have installed a 20-year restriction? When did you learn of that?

**A. Oh, just about -- I don't know -- less than a year ago. I wasn't aware of it before.**

Q. And do you agree with that position, and that is the FMHA's position?

**A. I don't know what their position is. I'm totally void of any opinion because it's too technical. It goes back to maybe laws are implied that aren't in writing and all that stuff.**

Q. Okay. We're entitled to get your opinion, so that is why I'm asking.

**A. Okay. All right.**

MR. ECKLAND: Would this be a good time for a short break?

MR. KESSLER: Sure. A short one.

(Recess taken.)

MR. KESSLER: Back on the record.

Page 127

(Deposition Exhibit No. 31 was marked for identification.)

We have what's been marked as Exhibit No. 31, which is a production from the Plaintiff, starting with we believe P-GV 00277. Exhibit 31 goes through P-GV 00356, but off the record, we noted that it is missing about a half a dozen pages intermittently where there's gaps in the numbers.

Also -- I don't want to speak for you.

MR. ECKLAND: Go ahead.

MR. KESSLER: Mr. Eckland believes that there might be other documents that should have been attached to this production, and at this time, we don't know where the missing pages are. Okay.

Q. (BY MR. KESSLER) Nevertheless, we have what appears to be about a 40-page or 50-page document or not a document, but a stack of papers.

Mr. Vasilatos, I can tell you that these papers were obtained from your lawyers, and to the extent that helps you, tell me what you think they are? Do you recognize basically the stack of documents to be something that came from your files, perhaps?

**A. I think they came from my files.**

Q. Notice on the top of the documents, the photocopy picked up holes on the top. Is that how you

Page 128

maintain your files is with two holes on the top of your pages?

**A. Probably at the time. It was probably some government folder I got where they do these up here at the top (indicating). So they may have been in there, but I don't keep them that way.**

Q. Okay. Starting on page -- the first page, P-GV 00277, do you recognize anyone's handwriting there?

**A. No.**

Q. Do you know who Debbie is?

**A. She was some -- I think she was an FMHA employee. Maybe not.**

Q. Do you know what file these documents came from?

**A. It appears they might have come from Wishing Well I files.**

Q. Did you have a file that contained documents and correspondence related to just prepayments?

**A. I had a number of files like that. This one here, this is a checklist I must have got from the government.**

Q. I was trying to understand if you have any idea what file, as far as your organization goes,

Page 129

what these would have been filed under?
A. They may have been filed under prepayment, government data or paperwork.
Q. And turning to page p-GV 343 towards the end, near the back, can you tell me what this letter is on page 343?
A. Yeah. This is a letter I submitted or sent to Jackie Gleason at the time, stating that I was interested in forming a nonprofit corporation and transferring the project into this nonprofit so I could continue in low income housing.
Q. In the first sentence of your letter, you said NRCB plans to prepay their loan to FMHA.
Are you basically invoking your right to prepay?
A. Yes. Based on my knowledge of or limited knowledge of not knowing the ramifications of that.
Q. Well, at the time, you believed you had the right to prepay. Correct?
A. Yes. Right.
Q. And on the second paragraph, it says please provide me with a list of additional information that you will need from us at this time. Please underline the data in FMHA 1965-B that we need to submit

Page 130

to your organization to begin the prepayment process.
Do you know how or when you became aware of that process?
A. No. I don't remember.
Q. Can you go back to that letter, please, on page 343 and tell me on the handwriting at the bottom, is that your handwriting?
A. Yes. Yes. It is.
Q. Can you read it for me, please? What does it say?
A. "I sent this about 12-5-89 and I have not heard any reply since 12-12-89."
Q. What is the very first word of that?
A. Loial. That's the property manager, my property manager, Loial Hass.
Q. And did you eventually hear back from FMHA?
A. I think I did hear back.
Q. How about turning to page 341?
A. Okay.
Q. Does that appear to be a response to your earlier letter at page 343?
A. Yes.
Q. And the handwriting on the top left corner, the small handwriting, is that your handwriting?

Page 131

A. Yes.
Q. I apologize, but the copy is not excellent. I don't know what the original looks like, but can you try to read that and tell me what it says?
A. "Look this over and call me. I would like to expedite the process. I need a pro forma on the merits" or something.
MR. ECKLAND: Of the private organization and raising rents only $15 a month.
THE WITNESS: Probably pro forma. Private pro forma. In other words, a pro forma P and L based on owning it outside of the government, prepaying the government and renting private market, subsidized. That is essentially what I was trying to tell him.
Q. (BY MR. KESSLER) Is there more to the note?
A. Please prepare a draft to tenants telling them that they can stay, no change. Something about maybe paying rent, $15 more a month.
Q. Can you read the last two sentences?
A. "Perform equal or better on a private nonprofit." That is what I was trying to tell him.
Q. Did you eventually compile the information that was requested by FMHA?
A. No.

Page 132

Q. Why not?
A. In the meantime, I did my own analysis and I determined that it just wouldn't work. My ideas were not feasible to make a viable private project. I just could not cut enough expenses to reduce the rents down and still borrow three or 400,000 at market rate, and have debt service on top of my expenses to come out with as good as the government was doing. So I backed out.
Q. Turn to page 334.
A. 334. Okay.
Q. This is a letter from you.
Does this indicate that as of January 15, 1990, you were still pursuing the prepayment option and that you were providing, as it says in paragraph 2, the information per your Exhibit C is hereby submitted as a separate attachment labeled Exhibit C.
A. Yeah. I think that we had -- I think Loial compiled most of this, and I think we did send this summary data. It was not a complete package at the time.
Q. What was missing?
A. I think the market study and a bunch of other -- some other stuff I can't remember.
Q. And then, the handwriting there that

Page 133

says attached is a payoff commitment?
A. From Frontier Bank.
Q. Is that your handwriting?
A. Yeah. I believe that was. It looks like it, kind of. It doesn't quite look like my handwriting, but I do some kind of printing that way.
Q. Do you recall getting that commitment from Frontier Bank?
A. Let's see if there's a letter saying they had some money available.
Q. I don't see it immediately.
Turn to page P-GV 332.
A. Okay.
Q. Do you recall receiving this letter?
A. Yes.
Q. And does that indicate to you that FMHA was considering your prepayment request as of January 24, 1990?
A. Yeah. I had given up on it by the time they responded back to me, but if I remember correctly --
Q. Did you notify anybody?
A. I can't recall. I may have notified Laurel.
Q. I'm sorry?

Page 134

A. I may have notified them, but it must have been verbally that I was backing off.
Q. Did you say Loial?
A. This is Andrew, this district loan specialist.
Q. What are you basing that on, that you had not notified Laurel before they got back to you?
A. Well, I had figured out that I couldn't do a nonprofit prior to getting this letter. I think I may have asked for some information. She was responding, and then, in that time period of a month or two, I gave up. I think I may have -- I don't think I -- I don't know if I called her or not verbally and said I'm shutting down my interest in a nonprofit.
Q. So as you sit here today, you don't know whether you called Laurel or not?
A. That's right. I don't know.
Q. And you don't know whether you sent her a letter?
A. I don't know that either.
Q. Okay. Is it possible you never informed Laurel prior to -- is Laurel a woman?
A. Yes.
Q. Prior to her getting back to you?
A. Well, we had a -- we had a good rapport.

Page 135

We were communicating about every week since I was -- and, so I'm pretty sure.
Q. You're pretty sure about what?
A. I'm pretty sure about telling her that I was not going to go through. I was stopping my application.
Q. But you don't know whether it was in writing or by phone call?
A. I don't know if it was writing or phone call. Correct.
Q. Do you remember what she said when you told her that?
A. No. I don't.
Q. Do you remember when in the process you told her that?
A. When? The process? I'm quite sure -- I think it was before I got this other letter.
Q. What are you referring to?
A. This letter of January 24th.
Q. And what do you base that on?
A. Oh, just from my recollection that I had mentally reviewed my pro formas on transferring into the nonprofit, and the feasibility just didn't make sense.
Q. Now, the letter you're referring to is on P-GV 334, the January 24th letter?

Page 136

A. Yes.
Q. Was this letter sent to you?
A. Let's see. It may have been -- I don't know if it was sent to me or Kemper Consulting, my property manager.
Q. Well, do you recall receiving it?
A. I don't recall receiving it.
Q. Is there any --
A. I probably did.
Q. Is there anything in that letter that acknowledges that you had withdrawn your prepayment request?
A. No. Not that I can tell right now.
Q. Does that leave open the possibility that you had informed Laurel at the time of this January 24, 1990 letter?
A. It is possible that I could have given up a long time before that.
Q. I'm sorry?
A. It may have been before that, before I even told Loial Hass that it didn't make sense to pursue this any further.
Q. Right, but I'm trying to find out -- and it is based on your answer -- when you informed -- if you informed FMHA of your decision to withdraw your

Page 137

prepayment and when you made that.
A. **I just don't know. I honestly don't know when.**
Q. That's okay.
A. **I just don't know the dates. Too long ago.**
Q. Right. Okay.
Turning to page 329, is that a note to you? Are you the Tom?
A. **Yes.**
Q. And that is from Loial, your partner?
A. **No. He's the property manager.**
Q. I'm sorry. The property manager. Take a look at that. Okay?
A. **Okay.**
Q. So does that indicate that by January 31, 1990, you had not informed Laurel that you were abandoning the prepayment request?
A. **I'm not sure. I may have -- I don't think I wrote him. I would have called him, but it may have been after that.**
Q. Well, doesn't the letter, the note on page 329 indicate that Loial, your property manager, was tracking down information for Laurel in connection with the prepayment request?

Page 138

A. **Um-hum. Yes.**
Q. And would he --
A. **It could well be he was going in one direction to be continuing the process, and I had not informed him, and I had mentally given up.**
Q. Would you conclude from looking at the note from Loial that Loial was working with someone from FMHA, maybe Laurel, continuing to work with her or somebody else at FMHA concerning your prepayment application?
MR. ECKLAND: Objection. Calls for speculation.
Q. (BY MR. KESSLER) You can answer it.
A. **It's entirely possible that he was talking to her. I'm sure this letter infers that.**
Q. Okay. Turn to page 328, please.
A. **Okay.**
Q. What is that on page 328?
A. **328 is a letter to Snohomish County Economic Development Council.**
Q. First of all, did you draft this?
A. **I'm not sure if I drafted it or not, or Loial drafted it.**
Q. Do you know if it was sent out?
A. **No. I don't know that either.**

Page 139

Q. Do you understand this letter, 328, to be in connection with the prepayment application process?
A. **At that stage, I assumed it was a Farmer's Home prepayment requirement, but it was just -- just wanted numbers. I'm not sure. By this time, I had concluded anyway that I could not sell it, sell any of the projects without getting -- because of the recapture of capital accounts.**
Q. Are you aware of any other reason for this letter to be sent to the Snohomish County Economic Development Council other than in connection with FMHA requirements relating to your prepayment request?
A. **I'm not sure.**
Q. Read --
A. **I'm not sure that this --**
Q. Read the middle paragraph, please.
A. **Request that Farmer's Home payoff the balance of the loan. I'm just reading this to myself. This would have not gone to the ultimate because it was this time period, even back in '86 that when I looked at all the factors, I couldn't sell them.**
Q. I understand that, but this letter was drafted in connection with the prepayment request. Correct?

Page 140

A. **Right. Right. It may have been something that Loial Hass was doing because I asked him to fill out some of the paperwork to get it at one time going into a prepayment, and then, I withdrew.**
Q. Now, turning to page 325, there is a letter addressed to you from the Housing Authority of Snohomish County.
A. **Um-hum.**
Q. And the date is February 23, 1990.
A. **Yes. Um-hum.**
Q. Read the first paragraph, please.
A. **"In response to your letter of January 31, 1990, please be advised that the Housing Authority of Snohomish County is interested in purchasing Wishing Well to ensure its continued operation as a FMHA apartment complex for low income elderly and handicapped."**
**This is when I found out that they had no money. They had no money.**
Q. Does this indicate to you that the -- that a letter dated January 31, 1990 similar to the one on page 328 was sent to the Housing Authority of Snohomish County?
A. **Yes.**
Q. And does this indicate to you that the