M. Blan



IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---

GRASS VALLEY TERRACE, a )
California limited partnership, )
et al., ) File No. 98-726C
Plaintiffs, )
vs. )
THE UNITED STATES, )
Defendant. )

---

DEPOSITION UPON ORAL EXAMINATION OF

JAMES C.Y. KOH

---

Taken at 600 University Street
Seattle, Washington

DATE TAKEN: JUNE 9, 2004

REPORTED BY: MARY A. WHITNEY, RPR

EXHIBIT J

Page 38

that the government doesn't agree with your statement, correct?
A. Today, I know you take the other view by violating the promise or violating the intention or spirit of the documents, of the contracts.
Q. The government hasn't agreed with that statement either, correct?
A. That's correct. You don't agree.
Q. Let me go back to the question that I want to ask you, which is, paragraph 3, what does paragraph 3 mean?
A. According to paragraph 3, that we can prepay on June 30, 2009, and get out of the program, although it says 20 years of restricted period, between 1989 to 2009, it said that, but that was not my understanding by dealing with the government, by the conversation with the government officer, and by reading the documents, that it is just mentioned in three places at least.
Q. What does paragraph 3 mean? I'm confused, because you say you don't agree with the "understanding." You don't agree with what paragraph 3 says?
A. I agree in the paper it's correct. What I'm saying is it was not what I was informed and that's not what the contract said.
For the reason I mentioned to you, there is

Page 39

three places the contract say that we could prepay anytime, and also we could refinance and encourage us to refinance, and also any excess moneys be apply to the obligation.
So the spirit is we could prepay even before this 20-year restrictive-use period. That was what the government and what conversation I have with the officer.
But we did sign the 20 years' restrictive, so therefore. We could at least pay on June 30, 2009.
Q. So paragraph 3 is correct, in your opinion?
A. It's correct, but it's contrary with a lot of information that was transmit to me.
Q. Well, there is no statement of what the law is, other than the fact that you said, in paragraph 3, that you had the right to prepay the mortgages on each project on June 30, 2009. Do you agree with that?
A. Would you repeat again, please.
Q. Well, you agree with what you said in paragraph 3, that you had the right to prepay the mortgage on each project on June 30, 2009?
A. Yes. We have the right to pay and get out of that.
Q. And the reason you picked the date June 30, 2009, is because that is the end of the 20-year restrictive-use period?
A. Correct.

Page 40

Q. That restrictive use period came as a result of the agreements that you signed in 1989?
A. Correct.
Q. Now, are you trying to say that you think the restrictive-use agreement that was part of the documents that you signed in 1989 was contrary to law?
A. It was contrary what the message transmit to me and it was contrary to what I read from the document of those three places.
Q. So why did you say this, then, in November 16, 2000? Do you agree with this statement or not, in paragraph 3?
A. Yes --
MR. BLANDO: Objection; asked and answered.
Q. You can answer.
MR. BLANDO: He did. You can answer again.
A. Yes, I agree. I'm just explaining to you. That was -- this is what I signed, okay? It's what I signed. But I also signed the document that have three places, plus personal conversation, face-to-face conversation. All point to the fact that we can get out at any time before this 20 years restrictive period is mature.
Q. So, in November 16, 2000, you signed this declaration, but it was always your understanding that you could actually prepay, pay off, the FmHA mortgage at any

Page 41

time?
MR. BLANDO: Objection; mischaracterizes what his testimony was.
Q. Is that correct?
A. At the time I did not say, 2000. I say at the time we signed the assumption agreement, which is 1989. That was my understanding by reading the document and by the personal conversation, that my impression is that we can pay off and get out of the program anytime at that time when I assumed the ownership.
Q. Is that what paragraph 3 says?
A. No. Paragraph 3 say that we can pay off and get out of the program on June 2009.
Q. What's the difference?
A. A whole lot difference. I pay off anytime and get out of there or wait until 2009. There is a different time period there.
Q. Which one is true, in your opinion?
A. Both are true.
Q. The "restrictive-use period" that's referenced in paragraph 3, tell me what you think that means.
A. That means we have to continue on low-income housing until that time.
Q. So is it your opinion you could prepay the mortgage at any time?

MR. BLANDO: Objection; vague as to time period. I don't know if you're just not understanding or -- I mean, what he's saying, maybe you are just not understanding his testimony.

He's saying his understanding in '89, when he went into it, is he could prepay at any time. His understanding today and when he signed this declaration is that he now understands that the 20-year covenant means he could only prepay in 2009.

I'm not trying to put words in his mouth. I think that's what he's been saying over and over again. If you're just missing it, that's what he's saying, and I think you've asked the questions and he's answered it more than once.

Q. Mr. Koh?

A. That's what I repeatedly say, so --.

Q. So, what you're trying to tell me is that when you signed the agreement in 1989, it was your understanding that you could prepay the mortgage at any time you wanted, but that when you signed this declaration in 2000, you learned that there was a 20-year restriction?

A. Not at this time when I signed. I learned this, this -- the government told me in 1991, when I make my effort to prepare to get out of the program, then at that time they told me, "No, we need those. You couldn't get



out of there."

At that time I learned they go back on their own rule of prepayment anytime, so at that time I learned that we have to stick until 2009.

Q. Let me go back to paragraph 2, the previous page, on APP 14. The second to the last sentence says, "Our assumption agreements contain a 20-year restrictive use clause," and the next sentence you reference "exhibits A and B."

A. Yes.

Q. Let me take you to pages APP 20 and 21. Are these the restrictive-use clauses you're referring to?

A. Yes. It is -- yes.

Q. As you recall it, were they part of the assumption agreement in '89?

A. Yes.

Q. Is your understanding today about what these restrictive-use clauses mean on pages APP 20 and 21 different than what you understood it to be in 1989?

A. I understand what the paragraph said, but I also mentioned there was a conversation between the responsible officer and myself.

I also read the document. At least three places all imply implicitly or explicitly that the intention of the government is to get the money out of the



owner as soon as possible.

That's why they encourage people to get finance, get commercial financing, and also -- also they demand any excess on reserve if there is not agreement of disposement -- then it must be applied to the obligation, to the mortgage.

So it all implies that the government want to get the money out and use it to build more houses.

Q. That's not what this clause discusses, this clause discusses when you can get out, correct?

A. I understand. I'm only saying this clause and what I told you are not conflicting at all, because this is part of the document, the document -- the contract is also part of the document.

The government told me they preferred to have money, so I assumed the government at the time assumed this is not important. "We will take our money and go."

Q. Who told you it was not important?

A. I did not say important.

Q. You said you assumed that?

A. Yes, I assumed.

Q. What were you basing your assumption on?

A. Because he told me that we prepay anytime. Plus the three places in the contract says so.

Q. Who says?



A. In the contract.

Q. Who told you?

A. Who told me what?

Q. I thought you said "he" said. Who is "he"?

A. Don Wagoner.

Q. Did you think Don Wagoner's promises -- is what you're saying that Don Wagoner's promises made you believe that these were not important?

MR. BLANDO: He didn't say not important.

Q. Go ahead and answer that. Would you agree with that?

A. I'm saying in the conversation he say, "If you can prepay, we'll use the money to build more houses." It's logical. I believe what he saying, it's logical.

And also, as I said, there is another three places -- in the document they say anytime the borrower can prepay on the place, can prepay on the mortgage, that's one place.

Another place is applied -- "cash of excess on reserve must be applied immediately to lower debt obligation." That's No. 2.

No. 3 is there is lots of encouragement to have refinancing as soon as the borrowers are able to.

Q. These three clauses you're referring to, these are not in the 1989 assumption agreement but in the 1979

A. I don't recall the exact date. It's around that time.
Q. You don't need the exact date.
A. 1991 is close.
Q. Without going through each and every paragraph in this declaration, is it accurate to say that you never did prepay in connection with that request?
A. The government give all the trouble and excuse to prevent us.
Q. What did you say besides "excuse"?
A. "Trouble."
Q. So you would agree, then, you didn't prepay in response to that request or you weren't allow to prepay in response to that request?
A. We did not prepay. We did not prepay, although we made an effort.
Q. Okay. That's all I was getting at.
A. But we spent lots and lots of money there. If the government not encourage us to prepay or make an application, we would not spend lots of money on the effort.
Lots of money means we have appraisals. We have to put money with the financial institutions to process in order for them to do the financing preparation. So we spend lots of time and effort.



Q. But you never did prepay?
A. We never did.
Q. Okay.
A. But the point is, we suffer lots of losses or damages.
Q. When did the projects, these two apartments, stop being in the family trust's ownership or your family's ownership?
A. In 2001.
Q. Do you know which month, by any chance?
A. I don't know the detail. Not exactly.
Q. And tell me about that. How did it go from being in your family and who did it go to? Describe that to me, please.
A. The government told us we cannot prepay after 2009, we are going to get stuck for indefinite period of time, because there is a need for the low-income housing in the area.
So, therefore, we want to -- and also the government instruct us that they prefer us or almost force us to sell it to a nonprofit organization, and so under the circumstances, we have no choice but to sell it at basically half-price -- big discount.
Q. There is a lot there, and I think we're going to spend some time talking about that because you've raised



several different issues.
First, I want to go back to your point that the government -- is what you just said, are you saying that the government said you could not prepay even after June 30th of 2009 because there was a need for the housing?
A. Yes.
Q. Are you saying that somebody from the government told you there was going to be a need for the housing after 2009?
A. There is indication -- and I know, too, that the place is growing, the population is increasing, yet there is no significant new low-income housing. In fact, there is no new low-income housing being built there.
Q. So what is your answer to the question? Did somebody from the government tell you that there was going to be a need for the housing after 2009?
A. I have to look at my document, but the document I read, available document, all to point out to the federal government -- where maybe he did not say after 2009, but the indication is we need the housing there, and I know we need the housing there, for a very, very long time to go there.
Q. So you have an opinion that if it was needed -- well, let me just back up.
You actually made two payment requests during



the 1990s, correct?
A. Yes.
Q. And is it fair to say that sometime during one or both of those prepayment requests you were told by somebody from the government that one reason that they could not accept -- either one reason or the reason they could not accept it -- your prepayment request is that there was still a need for the housing? Is that correct?
A. Correct.
Q. I think what you just said is you're not saying that a government person told you that there was still going to be a need for the housing after 2009. That's your opinion; is that correct?
A. I am not too certain definitely myself that the government told me 200- -- after 2009, but I take from the government's documents it implies that there is going to be a need in the area.
Plus, my own assessment, there will be a whole lot of need there because the place is desirable place. This is so-called bedroom place there. There is lots of need over there, population increase.
The economy is booming going there, and Bremerton Shipyard is there. It is very growing area. The population is increasing. But there is no significant housing increasing there.

Page 118

true that you'd already removed funds from the reserve account in the Heritage property? At the time that you sold it to the Kitsap County.
A. Yes.
Q. Earlier today you suggested that you sold these properties -- your words were -- about "half-price."
A. Yes.
Q. What do you base that on?
A. As I stated before, if we don't have to stick with the program, if the government don't violate the agreement, we would be able to put property on the free -- either on the free market or raise the rent to have a higher rent, or convert into condo, and they will result in a significant higher values.
Q. You couldn't do that in the year 2000, right?
A. We could do it at 2007 or '-9. I forgot. I mixed up some time.
Q. In fairness, I think it was 2009.
A. We could when the time come.
Q. You understood that to be 2009 based on our previous discussion. Do you still understand that to be the date?
A. At 2009, yes. But even if we sell ahead of 2009, even if we sell today, without that we have to stick with low-income housing property forever, then we can sell it in

Page 119

anticipation of free market in 2009.
Q. You said that if you didn't have to stay in "low-income housing forever" -- is that what you just said -- you could have gotten more for it?
A. Yes.
Q. Who said that property has to stay with low-income housing forever?
A. I probably don't say correctly, just expression that's exactly right. It means that we have to stay there for a long time, assume there is a need for housing and proof that we will need low-income housing for a long time.
MR. KESSLER: I'm going to mark another exhibit.
(Exhibit No. 253 was marked for identification.)
Q. Mr. Koh, I'm showing you what's been marked as Exhibit No. 253. Unlike the last document, the numbers on the bottom, "GV," starting with 7004 and going through 7006, those show that the government produced these documents to your lawyers.
A. Yes.
Q. So, unlike the last one, we didn't get this from your lawyers, we gave this to your lawyers from the government's files.
And you'll see at the last page, 7006, that

Page 120

it is signed by "Susan M. McKitrick, Rural Development Specialist." Do you know who she is?
A. The name seems to be familiar.
Q. Familiar as the rural-development specialist working for FmHA dealing with the prepayment request or the sale?
A. Yes.
Q. On the top it says, "Viewmont East Apartments," and it's dated April 26, 2001. It says on it, "November 29, 2000, a meeting was held to discuss prepayment with the borrower. In attendance was Chris and David Koh, 2 of 5 borrowers, acting on behalf of all 5 individual borrowers, for Viewmont East Apartments (also known and recorded as ABCD Trust and the James and Maria Koh Trust," and there are others.
Is there a James and Maria Koh Trust?
A. Yes.
Q. Does the James and Maria Koh Trust own or did it own Viewmont East prior to the 2001 sale?
A. No.
Q. In the second paragraph, in the underlined portion of that paragraph, it says, "The borrower indicated in their request that they are willing to sell a new restrictive-use agreement to extend the low-income housing for another 20 years."

Page 121

Do you see that?
A. Yes.
Q. Did your family sign that restrictive-use agreement in connection with this 2001 sale?
A. Again, this is simultaneously with the stipulation of selling to the Kitsap Housing Authority.
Q. Right.
A. These are together, not just one.
Q. Yes. So that's a yes?
A. Because we -- yeah. Okay.
Q. If you go to the next page, which is GV 7005, the third paragraph where it begins, "We received comment from one party, Renee Greenman," do you know who Renee Greenman is?
A. I don't know him.
Q. It says that that person is "Director of the Department of Housing and Urban Development (HUD), Seattle office."
Then this document goes on to say, "Their response was that they do not take exception to the prepayment. Although the current owner's loan may be extinguished, HUD will continue to provide oversight and compliance monitoring with Section 8 contracts on the property as long as the property remains enforceable."
Does that sound consistent with your