**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

AUDREY S. KOH; BARBARA E. KOH; CHRISTOPHER J. KOH; DAVID A. KOH; MARIA L. KOH; and ABCD TRUST,
6669 NE Windermere Road,
Seattle, WA 98115

Plaintiff,

v.

UNITED STATES OF AMERICA,
Defendant.

**AMENDED COMPLAINT FOR BREACH OF CONTRACT AND JUST COMPENSATION**

**File No. ____________________**

For their Complaint against the defendant United States of America, plaintiffs state and allege as follows:

## PRELIMINARY ALLEGATIONS

1. Plaintiffs contracted with the United States of America ("the Government") for two loans to provide rental housing for low- and moderate-income persons for a minimum time period of twenty (20)-years ("the housing program"). The Government entered into these contracts ("the contracts") with plaintiffs by and through its agency, the Farmers Home Administration, United States Department of Agriculture ("FmHA").

2. The terms of each contract permit plaintiffs to terminate their participation in the Government's housing program "at the option" of plaintiffs upon prepayment of their federally made or insured mortgage. Pursuant to each contract, said optional termination right could be exercised by plaintiffs "at any time" prior to the termination of the fifty (50)-

year term of their contract, subject to the terms of any applicable 20-year restrictive-use provision.

3. Congress in 1988 and 1992 enacted legislation that repudiated the Government's contractual obligation to permit FmHA contract holders to terminate their contracts at any time at their option. As is alleged more fully below, plaintiffs contend in this action that the enactment of this legislation anticipatorily repudiates the contracts between defendant and plaintiffs. As is their right, plaintiffs have elected to treat the Government's anticipatory repudiation as a breach of contract as of the date of Government performance required by the contracts, i.e., the date that plaintiffs would achieve their option of terminating their contract but for the Government's repudiation. Plaintiffs also allege that said legislation results in a taking of plaintiffs' property without just compensation.

4. Plaintiffs seek to recover in this action the damages they have suffered and continue to suffer as a result of the breach by the Government of plaintiffs' contracts and for just compensation for the taking of their property.

**(Pre-1979 FmHA Contracts)**

5. Plaintiffs assumed two FmHA contracts that were originally formed before December 21, 1979 ("the pre-1979 FmHA contracts"), and thereby are contractually entitled to terminate their participation in the Government's housing program by exercising their option to prepay at any time, subject to the terms of any applicable 20-year restrictive-use provision. Such a prepayment would enable plaintiffs to "go to market" and use or dispose of their properties by either (i) raising the properties' rents to commercial rates; or (ii) selling the properties for their commercial fair market value.

6. The 1988 and 1992 Legislation described below repudiated the contractual right of FmHA contract holders to terminate their contracts at any time at their option.

**THE PARTIES**
**(Party Plaintiffs)**

7 Plaintiffs, Audrey S. Koh, Barbara E. Koh, Christopher J. Koh, David A. Koh, Maria L. Koh, and ABCD Trust, with an address at 6669 NE Windermere Road, Seattle, WA 98115, holds two contracts for rental housing at the following properties known as:

(i) Heritage Apartments, case and project number 56-018-0027302601-02-2, consisting of fifty-six (56) units, which originally closed on October 24, 1979; and,

(ii) Viewmont East Apartments, case and project number 56-018-0027302601-01-2, consisting of seventy-six (76) units, which originally closed on December 16, 1977.

**(Party Defendant)**

8. The FmHA is an agency of the defendant. At all times relevant to the allegations in this Complaint, FmHA and its respective officials and employees were acting as agents of the defendant. Pursuant to the Federal Crop Insurance Reform and Department of Agriculture Reorganization Act of 1994, Pub. L. No. 103-354, § 233, 108 Stat. 3178 (1994), the Secretary of the Department of Agriculture was authorized to establish a successor agency to Farmers Home Administration known as Rural Housing and Community Development Services ("RHCDS"). Effective January 30, 1996, RHCDS changed its name to Rural Housing Service ("RHS"). (Agency Name Change, 61 Fed. Reg. 2899 (1996).) RHS is itself part of the area within the Department of Agriculture known as "Rural

Development." As used herein, "FmHA" shall refer to Farmers Home Administration or its successor agencies, as appropriate.

9. An actual controversy exists between the parties.

## JURISDICTION

10. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1491.

## BACKGROUND

11. Prior to the 1960s, Congress sought to provide low-income housing primarily by subsidizing projects developed, owned, and managed by local government public housing authorities. During the 1960s and the 1970s, Congress changed its approach and enacted legislation to encourage private developers to construct, own, and manage large numbers of federally assisted housing units for low- and moderate-income residents.

12. In furtherance of this changed approach, Congress authorized FmHA to make or insure loans to private entities in order to stimulate the private development of federally assisted housing for low- and moderate-income and elderly residents in rural areas of the United States. Congress began this program in 1962 by adding Section 515 to the Housing Act of 1949 (Pub. L. No. 87-723, § 4(b), 76 Stat. 671 (1962)) and expanded its scope in 1968 by adding Section 521 to that Act (Pub. L. No. 90-448, Tit. X, § 1001, 82 Stat. 551 (1968))(now codified at 42 U.S.C. §§ 1485 and 1490a, respectively). Housing projects subject to Sections 515 and/or 521 of the Housing Act of 1949 are referred to herein as "FmHA projects."

13. Plaintiffs assumed Loan Agreements with the FmHA that, pursuant to Sections 515 and/or 521 of the Housing Act of 1949, as amended, 42 U.S.C. §§ 1485 and 1490a, pertain to the construction, rehabilitation, or improvement of two housing projects. The Loan Agreements, *inter alia*, imposed significant obligations on plaintiffs regarding the tenants to whom plaintiffs could rent, the rents they could charge, the profits they could receive, and the maintenance and financial operation of the properties ("the low income affordability restrictions").

14. Contemporaneous with the assumption of the Loan Agreements, and referenced therein, the plaintiffs assumed, *inter alia*, Promissory Notes and Real Estate Mortgages for each project. In assuming the Promissory Notes, plaintiffs promised to pay to the order of the Government, in scheduled installments, the entire principal due pursuant to the Loan Agreements, together with interest at a specified rate. The Promissory Notes provided, *inter alia*, "Prepayments of scheduled installments, or any portion thereof, may be made at any time at the option of Borrower."

15. By assuming the Loan Agreements and the Promissory Notes referenced therein, plaintiffs promised, *inter alia*, (i) to construct and maintain housing in accordance with FmHA's specifications; (ii) to use their FmHA projects for the purpose of housing people eligible for occupancy as provided by Section 515 and appropriate FmHA regulations; (iii) to charge no higher rents than those permitted by FmHA; (iv) to make timely payments on their mortgages; and (v) to maintain certain cash reserves. In exchange, the Government agreed to allow plaintiffs to free themselves of FmHA's regulatory strictures in accordance with the contractual provisions of the Promissory Notes.

16. The Loan Agreements obligate the plaintiffs to operate their housing properties in accordance with FmHA regulatory strictures only so long as plaintiffs' indebtedness and other obligations under each Promissory Note, Real Estate Mortgage, and any related agreement remain unsatisfied. Thus, plaintiff's obligation under the Loan Agreements to operate their housing properties in accordance with FmHA regulations expires upon their prepayment in full of their indebtedness and satisfaction of any related obligations.

17. Consistent with the language of the Promissory Notes, FmHA regulations codified at, *inter alia,* parts 1865, 1866, and 1965, implementing Section 502 of the Housing Act of 1949, 42 U.S.C. § 1472, permit plaintiffs to prepay their mortgage loans at any time at their option, so long as they and their successors in interest continued to comply with the terms of any applicable 20-year restrictive-use provision.

18. Accordingly, plaintiffs are entitled under their Loan Agreements with FmHA, FmHA's regulations, and the Promissory Notes, to terminate their contracts by prepaying their mortgage loans at any time at their option to enable them to go to market and maximize their return on investment, subject to the terms of any applicable 20-year restrictive-use provision.

19. Notwithstanding plaintiffs' contractual right to terminate their participation in the Government's housing program, the Government repudiated its obligation to recognize plaintiffs' right by enacting the legislation described below.

## CONGRESSIONAL ACTION

### The 1988 Legislation

20. On February 5, 1988, Congress imposed restrictions on prepayment repudiating the right of pre-1979 FmHA contract holders to exercise their contractual termination right at any time at their option by enacting Title II of the Housing and Community Development Act of 1987. (Pub. L. No. 100-242, 101 Stat. 1877 (1988), cited as the Emergency Low Income Housing Preservation Act of 1987 (codified as amended at 42 U.S.C. § 1472(c) and 12 U.S.C. § 1715*l* note) ("the 1988 Legislation" or "ELIHPA").) Congress made certain findings in the 1988 Legislation, including but not limited to the following:

> (i) some 150,000 units of rural low income housing financed under section 515 of the Housing Act of 1949 [i.e., FmHA housing units] are threatened with loss as a result of the prepayment of mortgages by owners;
>
> (ii) the loss of this privately owned and federally assisted housing would occur in a period of sharply rising rents on unassisted housing and extremely low production of additional low rent housing;
>
> (iii) a major review of alternative responses to this threatened loss of affordable housing is now being undertaken by numerous private sector task forces as well as State and local organizations;
>
> (iv) until the Congress can act on recommendations that will emerge from this review, interim measures are needed to avoid the irreplaceable loss of low income housing and irrevocable displacement of current tenants.

(The 1988 Legislation, Section 202(a).)

**(The 1988 Legislation's Prepayment Restrictions For Pre-1979 FmHA Contracts)**

21. Congress estimated that a large portion of the 367,000 units owned by both pre-1979 and post-1979 loan holders and originating between 1963 and 1985 were vulnerable to being prepaid during the few years following 1988. Post-1979 FmHA loan holders, however, unlike pre-1979 loan holders, already were contractually required to maintain their projects as low- and moderate-income housing for fifteen (15) or twenty (20) years. Thus, until such time as Congress could act on recommendations resulting from the continuing reviews of alternative responses to the perceived imminent loss of affordable housing and devise a permanent solution for all FmHA loans, the 1988 Legislation confined itself to dealing only with the pre-1979 FmHA loans, i.e., those FmHA loans originating from 1963 to 1979.

22. The 1988 Legislation contained measures designed to place the pre-1979 FmHA contract holders "on the same playing field" as the post-1979 FmHA contract holders already subject to a restrictive-use clause. For example, a pre-1979 FmHA contract holder could avoid a forced sale of its project by agreeing to extend its low-income use for a period of not less than twenty (20) years from the date of loan origination. (The 1988 Legislation, Section 241.)

23. Although denominated as an "interim measure," the 1988 Legislation specifically amended existing law -- Section 502(c) of the Housing Act of 1949 -- and did not expire automatically. Instead of repealing the "interim measures" directed at pre-1979

FmHA contract holders, Congress devised, in 1992, a permanent response for all FmHA loans, including those post-1979 loans with contractual termination rights.

24. Consistent with the provisions of existing post-1979 FmHA contracts containing restrictive-use clauses, the 1988 Legislation recognized the contractual right of post-1979 FmHA loan holders to terminate their contracts by prepaying their loans at any time at their option provided that the properties were maintained as low- and moderate-income housing for a period of fifteen (15) or twenty (20) years from the date of loan origination.

25. Contrary to the provisions of pre-1979 FmHA contracts, the 1988 Legislation repudiated the contractual right of FmHA contract holders to terminate their contracts at any time at their option. (The 1988 Legislation, Section 241.)

**The 1992 Legislation**

26. On October 28, 1992, Congress amended Section 502(c) of the Housing Act of 1949 by enacting the Housing and Community Development Act of 1992 (Pub. L. No. 102-550, § 2 & Tit. VII, § 712, 106 Stat. 3681, 3841 (1992) (codified in relevant part at 42 U.S.C. § 1472(c)) ("the 1992 Legislation or Title VII").) This amendment eliminated the interim measure status of the 1988 Legislation's provisions repudiating the contractual right of pre-1979 FmHA loan holders to terminate their contracts at any time at their option.

27. In addition to making permanent the temporary repudiation of the contractual termination rights of pre-1979 FmHA loan holders, the 1992 Legislation made permanent for all contracts formed before 1989 the restrictions that ELIHPA had imposed on pre-1979 FmHA contracts. (42 U.S.C. § 1472(c)(4)(A), as amended.)

28. For the first time, the 1992 Legislation permanently applied ELIHPA's restrictions to all FmHA contracts entered into before 1989. The statute made no exception for contracts entered into before 1979, nor did it single out (as ELIHPA had done for pre-1979 contracts) any special treatment for those contracts entered into between 1979 and 1989. Thus, the 1992 Legislation, signed into law by the President on November 2, 1992, together with implementing regulations, permanently repudiates the contractual termination right of any FmHA loan holder who chooses to terminate its contract.

29. Pursuant to the 1992 Legislation, holders of both pre-1979 and post-1979 FmHA contracts are permitted to terminate their contracts by prepaying their loans only in accordance with specified, non-contractual restrictions, including but not limited to the requirement that, before accepting any offer to prepay, the Secretary must make reasonable efforts to enter into an agreement to extend the low-income use of FmHA projects for not less than a period of twenty (20) years beginning on the date the agreement is executed. (The 1992 Legislation, Section 712, 42 U.S.C. § 1472(c)(4)(A).)

30. The 1992 Legislation authorizes FmHA, subject to various conditions and at its discretion, to offer limited, specified "incentives" to holders of FmHA contracts which, along with the threat of the forced property sales discussed below, are designed to induce said contract holders to extend the low-income use of their properties. In general, the incentives allowed owners whose properties satisfied various guidelines to apply for: (i) increases in the rate of return on investment; (ii) reductions of the interest rate on the mortgage loan; (iii) additional rental assistance; and (iv) an equity loan. (42 U.S.C. § 1472(c)(4)(B).)

31. The appraisal guidelines used by FmHA to determine incentives are inconsistent with standard appraisal guidelines and result in value determinations below fair market value.

32. For those FmHA project owners unwilling or unable to extend their participation in the Government's housing programs by acquiescing to the "incentives" outlined above, the 1992 Legislation provides for forced sales of said owners' properties to nonprofit organizations or public agencies approved by FmHA which are required to maintain the projects as low income housing, subject to FmHA's approval of financial assistance to the prospective purchasers. Under the lengthy, cumbersome, and costly procedures required, such owners are required to offer their properties for sale to such purchasers for an extended period without receiving "incentives" or any other compensation. (42 U.S.C. § 1472(c)(5)(A) - (F).)

33. Such forced sale proceedings can be avoided only if (i) the FmHA project owner agrees to continue to operate its project as low-income housing for a period determined by the Secretary, but not less than twenty (20) years from the date of loan origination, and to subject itself to the forced sale proceeding at the end of that period; or (ii) if the Secretary determines that housing opportunities for minorities will not be materially affected as a result of the prepayment and that either (a) tenants will not be displaced; or (b) there is an adequate supply of affordable rental housing within the market area of the housing that is assured of being made available to all current tenants. (42 U.S.C. § 1472(c)(5)(G).)

**Material Terms**

34. Plaintiffs' contractual right to terminate their contracts at any time at their option was a material term of their contracts. In the absence of this contractual termination right, plaintiffs would not have entered into their contracts with FmHA. But for the legislation repudiating plaintiffs' contractual termination right, plaintiffs would achieve their option of terminating their contracts on those dates that would maximize their investment return on their properties, or on such other dates as they would deem appropriate given their individual circumstances.

35. Plaintiffs have complied fully and in good faith in all material respects with the terms and conditions of their contracts and have otherwise fully performed their undertakings in connection therewith.

**THE IMPACT OF THE REPUDIATING LEGISLATION UPON PLAINTIFF**

36. The statutory scheme under the 1988 and 1992 Legislation and FmHA's implementing regulations repudiate the contractual right of FmHA project owners to terminate their contracts at any time at their option in part by (i) compelling them to extend the low-income use of their properties; and (ii) subjecting them to forced sales of their properties. The Government's repudiation does not constitute a failure to carry out any immediate duty of present performance unless and until the date of Government performance required by each contract arrives, i.e., the date that any FmHA contract holder would have achieved its option of terminating its contract but for the Government's repudiation. Thus, the Government's scheme constitutes an anticipatory repudiation of the plaintiffs' contractual termination right.

37. The legislation complained of herein also results in a taking of plaintiffs' properties for public use without just compensation. By requiring plaintiffs to house low-income tenants and to accept new low-income tenants, the Government has (i) conscripted plaintiffs' properties for public use; (ii) physically invaded or authorized others to physically invade plaintiffs' properties; and (iii) deprived plaintiffs of their distinct investment-backed expectations with regard to their properties, all without providing any just compensation.

## DAMAGES

38. Plaintiffs intended, upon entering into their contracts with the FmHA, to exercise their prepayment right and terminate their participation in the Section 515 program prior to the expiration of their full mortgage terms. Plaintiffs intended to prepay their post-1979 property, Heritage Apartments, upon the expiration of the twenty-year restrictive use provision applicable to that property, i.e., on or about June 30, 2009; and for their post-1979 property, Viewmont East Apartments, upon the expiration of the twenty-year restrictive use provision applicable to that property, i.e., on or about June 30, 2009.

39. Thus, the plaintiffs, as is their right, opted to commence this civil action before the date that the Government's performance is due, i.e., before (1) the date that plaintiffs intended to prepay each of their mortgage loans and terminate each of their contracts with the FmHA, and (2) the date that plaintiffs would have prepaid but for the Government's repudiation of their contract right.

40. Plaintiffs were ready, willing, and able to pay off their mortgage loan balances at the times they intended to exercise their right to prepay and leave the Section 515 program.

41. Plaintiffs have met with, or otherwise made inquiries of, FmHA officials regarding prepayment of their loans. Said Government officials have repeatedly represented to plaintiffs that prepayment without restrictions will not be accepted.

42. Notwithstanding the Government's conduct, plaintiffs submitted requests for the prepayment of each of their mortgage loans. The Government has failed and refused to accept any prepayment from plaintiffs pursuant to the provisions of their contracts.

43. The incentives and other alternatives potentially provided by the 1988 and 1992 Legislation and implementing regulations are wholly inconsistent with plaintiffs' original contract rights. Among other things, said incentives and alternatives would require plaintiffs to negotiate substitute alternative transactions with the party that repudiated their contracts, thereby exposing them to unreasonable financial risks. Moreover, said incentives and alternatives fall far short of compensating plaintiffs for the damages they have suffered and will continue to suffer as a result of the Government's repudiation of their contracts with plaintiffs, and would not provide just compensation to plaintiffs for the taking of their properties for public use.

44. As a result of the Government's repudiation of its contractual termination right, plaintiffs have been (i) deprived of their right to use or dispose of their properties as they see fit; (ii) compelled to allow the Government to use or authorize others to purchase and use their properties to fulfill the Government's undertaking to provide low cost rental housing to a segment of the public meeting Government eligibility standards; and (iii) required to continue to comply with the costly restrictions and obligations imposed upon them by their Loan Agreements.

45. But for the Government's conduct, plaintiffs would have terminated their contracts by prepaying their mortgage loans and/or selling their properties to third parties at fair market value. The Government has deprived plaintiffs of earnings on the sale of their properties at fair market value because its repudiation of plaintiffs' contractual termination right has prevented any prepayments, and consequently any market value sales, from taking place.

46. But for the Government's conduct, plaintiffs would have terminated their contracts by prepaying their mortgage loans and converting their properties into commercial housing for which it could obtain rents at market rates in excess of the rents chargeable to low- and moderate-income tenants under the Government's program. The Government has deprived and will deprive plaintiffs of the value of increased rents they would receive because its repudiation of plaintiff's contractual termination right has prevented any prepayment, and consequently any increase in rents, from taking place.

47. Plaintiffs have suffered other, additional damages including without limitation the lost opportunity costs associated with investment and business opportunities plaintiffs has been foreclosed from pursuing by virtue of their inability to exercise their contractual right to terminate their contracts at any time at their option.

**COUNT ONE**

(Breach of Contract)

48. Plaintiffs incorporate paragraphs 1 through 47 by reference as if fully set forth herein.

49. Defendant's legislation anticipatorily repudiated each contract between the defendant and plaintiffs. The Government's anticipatory repudiation has deprived and will deprive plaintiffs of their contractual right to terminate each of their contracts at any time at their option before the expiration date of each contract's fifty (50)-year term. The Government's anticipatory repudiation constitutes a breach of plaintiffs' contracts as of the date of Government performance required by each contract, i.e., the date that plaintiffs would terminate each contract but for the Government's repudiation.

50. As a direct and proximate result of defendant's conduct, plaintiffs have been damaged in an amount that will be proven at trial. Plaintiffs are continuing to suffer injury and resulting damages each day that they are denied the ability to exercise their contractual termination right and go to market with their properties at any time at their option.

**COUNT TWO**

(Just Compensation)

51. Plaintiffs incorporates paragraphs 1 through 50 by reference as if fully set forth herein.

52. As of the date of Government performance required by each contract entered into between defendant and plaintiffs, defendant's conduct constitutes a taking of plaintiffs' real and intangible property interests for public use and requires payment to plaintiffs of just compensation under the Fifth Amendment to the U.S. Constitution.

53. Plaintiffs are entitled to just compensation for the taking of their properties in an amount which will be proven at trial. Plaintiffs are continuing to suffer injury and

resulting damages each day that they are denied the ability to convert their properties to market rate or conventional properties.

## PRAYER FOR RELIEF

**WHEREFORE**, plaintiffs pray for judgment as follows:

### AS TO COUNT ONE

1. That the Court award plaintiffs monetary relief for the damages suffered to date and for the damages plaintiffs continue to suffer as a result of defendant's breaches of plaintiffs' contracts, in an amount to be determined at trial.

### AS TO COUNT TWO

2. That the Court award plaintiffs just compensation during the period during which plaintiffs' properties have been taken for public use by defendant, in an amount to be determined at trial.

### AS TO ALL COUNTS

3. That the Court award plaintiffs their attorneys' fees and expenses as allowed pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412 et seq., the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, 42 U.S.C. § 4654(c), and other applicable law.

4. That the Court award plaintiffs their costs and interest as allowed by law.

5. That the Court grant such other and further relief as the law and the evidence may justify and as the Court may deem just and proper.

Dated: February 6, 2006

**Filed Electronically**

**s/Jeff H. Eckland**

JEFF H. ECKLAND
Mark J. Blando, Of Counsel
ECKLAND & BLANDO LLP
500 Lumber Exchange
10 South Fifth Street
Minneapolis, MN 55402
Tele: 612-236-0160
Fax: 612-236-0179

Jerry W. Snider, Of Counsel
William L. Roberts, Of Counsel
Mark D. Savin, Of Counsel
FAEGRE & BENSON LLP
2200 Wells Fargo Center
Minneapolis, MN 55402
Telephone: (612) 766-7000
Facsimile: (612) 766-1600

*Attorneys for Plaintiffs*

M2:20768826.01